2024 IL App (2d) 230292-U
No. 2-23-0292
Order filed November 6, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 23-CC-22 |
| DEANDRE BRADLEY, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Finding of direct criminal contempt was proper where defendant repeatedly interrupted and demeaned the court with profane and derogatory language. (2) Failure to transfer the matter to another judge for adjudication of contempt was not error where defendant's conduct disrupted the proceedings and required immediate action to restore order.

¶ 2    Defendant, Deandre Bradley, appeals from an order finding him in direct criminal contempt of court and sentencing him to six months in jail. Defendant contends that (1) his "brief disparaging comment about the judge" was an insufficient basis for his conviction and (2) the trial

court's failure to transfer the case to an impartial judge for adjudication of the alleged contempt deprived him of procedural due process. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In open court on August 14, 2023, the trial court found defendant, then *pro se*, in direct criminal contempt of court. The following background places the August 14, 2023, proceeding in its proper context.

¶ 5      On April 6, 2023, defendant appeared with his public defender to advise the trial court that defendant wished to represent himself on his numerous pending felony charges. After speaking with defendant, the court granted defendant's request to proceed *pro se* and allowed the public defender to withdraw. When the court told the public defender to return all discovery to the State, the public defender advised the court that he had not yet received any discovery. The court then asked the State when discovery would be available to tender to defendant. The State replied that "it's going to take a couple of weeks because normally [the State] [does] electronic discovery." The State explained that it would have to "download everything and print it out." When the court attempted to set a date for the State to tender discovery, defendant refused to agree to a date. Instead, defendant indicated that he had two motions to file. Specifically, he was seeking "a court order for the immediate release of [his] medical records" and "a preliminary hearing in the allotted time presented by the law." The court told the State that a preliminary hearing needed to be set. When the State proposed a date, defendant protested that the date was "past the time." As the court began advising defendant that he could file a motion challenging the date if he felt there was a problem, defendant interrupted the court. The court admonished defendant, "Don't interrupt me." The court set the matter for May 3, 2023, and told defendant "to file the appropriate motion" if

that date was problematic. The court further stated, "After the preliminary hearing or the indictment, whichever happens on May 3rd, we'll set [defendant's motions] for hearings."

¶ 6     The parties next appeared on May 3, 2023. The trial court noted that "a 10-page indictment" had been filed on April 27, 2023, and the State provided defendant with a copy.[1] The State indicated that it had received two motions filed by defendant: a "notice of claim of unconstitutionality or preemption by federal law" and a "motion for court's order for the immediate release of all defendant's medical records and file." When the State argued that the motions were premature, defendant apparently agreed. Defendant asked if the State would be tendering any discovery, and the State indicated that it did not have any available that day. The court then advised defendant that it would wait for defendant to receive all discovery before it ruled on his motions. The court suggested that the parties first set a date for discovery. Defendant then indicated that he had "a motion for a discovery violation that [he] would like to file." The court told defendant that he could file the motion but that the court did not see how there could be a discovery violation when the parties were "still in the middle of discovery." Defendant argued that "Discovery Rule 411 say [sic] you can't start discovery or engage in no discovery prior to or during the course of a preliminary hearing." The court advised defendant, "We're not going to

---

[1]The common-law record does not contain any documents from the criminal matter (case No. 23-CF-516). Nevertheless, according to proceedings on August 15, 2023, defendant was ultimately indicted on nine felonies, including "attempt first degree murder," "armed robbery," "aggravated vehicular hijacking," "aggravated kidnapping," three counts of "armed violence," "armed habitual criminal," and "unlawful possession of a weapon by a felon."

argue your motion now." Defendant then stated that he wanted to set a trial date of June 8, 2023. Thereafter, the following exchange occurred:

"THE COURT: Even though you have no discovery, you want to set the case for trial?

THE DEFENDANT: I want to set the trial date for June 8th. I got a speedy trial right.

THE COURT: All right. If you are demanding a speedy trial, they pick the date.

THE DEFENDANT: I've been demanding—

THE COURT: Sir—

THE DEFENDANT: —my right to speedy trial is automatically safeguarded the date I'm arrested so.

THE COURT: They pick the date, though, because the clock is on them, not on you. So they pick the date.

THE DEFENDANT: The clock is 120 days. And so—

THE COURT: We're all aware of what the clock is, sir.

Is the State available June 8th?

THE DEFENDANT: Today would be my demand for a right to a speedy trial. Today I will just be letting him know that I want to set a trial date as far as my speedy trial right goes. It attached to me they [*sic*] day I got arrested.

THE COURT: We can't give you a trial date if you don't stop talking.

THE DEFENDANT: Give me a trial date. I have a speedy trial right.

THE COURT: Stop talking.

Mr. Stajdohar, are you available the 8th?

MR. STAJDOHAR [(ASSISTANT STATE'S ATTORNEY)]: No, Judge. We're not ready for trial yet.

THE COURT: All right. Well, he's made a demand. So you need to pick a trial date.

MR. STAJDOHAR: August 21st, Your Honor?

THE DEFENDANT: Way past the demand for my right to—

THE COURT: There's the appropriate motion to file if you in fact believe that to be true.

THE DEFENDANT: Okay. But not—not for you to be impropriety [*sic*] and allow them to go past the date, though.

You know the law, and you're supposed to uphold it; right?

THE COURT: I don't know if that is or is not past the date.

THE DEFENDANT: What date was I arrested?

THE COURT: I'm not doing the math.

Could we set it for August—

THE DEFENDANT: What date was I arrested, State?

THE COURT: August 17th at 1:30, [State].

THE DEFENDANT: I object to that date.

THE COURT: All right. Your objection is noted for the record. And that protects your speedy trial rights on the motion to dismiss.

But we need to get a date before that because we have to resolve the motions that—

THE DEFENDANT: Right. So that's—

THE COURT: —have been filed.

MR. STAJDOHAR: Judge, I'm going to suggest June 16th, if that's an available date.

THE DEFENDANT: I'm going to object to that. I suggest May 18th.

THE COURT: Court's not available May 18th.

THE DEFENDANT: Of course not.

THE COURT: Excuse me?

THE DEFENDANT: Of course not.

Every date I say it's a problem.

THE COURT: All right. If you talk back to me like that again, I'm going to hold you in contempt of court.

THE DEFENDANT: You think I care that you hold me in contempt of court?

THE COURT: All right. You are in direct criminal contempt of court.

THE DEFENDANT: That's fine.

THE COURT: Take him out of the courtroom.

THE DEFENDANT: That's fine.

You sat there and denied every one of my rights. I don't like that, and I'm in contempt of court for it.

THE COURT: All right. We'll set it for May 18th. I'll make myself available."

¶ 7    The parties next appeared on May 18, 2023. At the outset, the trial court advised defendant that it had vacated the previous contempt finding. The court also noted that defendant had "filed a number of motions" that the court had not had time to review. Defendant indicated that he wished to file another motion. The court stated,

"I want to set these over for a date when we can spend the afternoon doing the motions so we can take our time because you think that I'm not on your side. I'm not on your side like a lawyer would be but I want to make sure you're treated fairly and get a fair trial."

The court set the matter for June 8, 2023, and told defendant that he should file any additional motions in time for the court to review them before the June 8 date.

¶ 8    Defendant then indicated that he wished to make an oral motion. He stated:

"I'm in segregation and they don't allow us to have the little—you know, we get the law library on a tablet. So they don't allow us to have the tablet inside the cell. So we only get what's considered an hour of rec time. And during that rec, I have to shower. And seeing that I'm a little disabled, my shower takes like 30 minutes. Then that leaves me with 30 minutes a day to troll this what's called a citation—example citation site.

This ain't the law library. I can't ask nobody no questions. I can't get no actual help, you know, assistance as like a real lawyer. I'm in prison. They got a real lawyer up here.

All I have is 15 minutes to troll an example citation site which requires me to write down everything that I need to know or everything that I want. I would have to write an entire case down to go in the cell and study it. And that's denying me meaningful access to the court.

So I'm asking that you grant a motion to allow me as a *pro se* defendant to have access to that tablet while I'm in my cell."

The court told defendant that it "can't order the jail as to how to enforce their rules" but that it would "contact Commander Flowers, advise him of [defendant's] situation, and ask him to please,

basically as a courtesy to the [c]ourt, allow [defendant] extra time on [his] tablet because [he's] representing [himself] in this case."

¶ 9     On June 27, 2023, the trial court told defendant that he was brought to court for the State to "hand [him] some discovery and some motions." The State "hand[e]d *** defendant People's Discovery Disclosure[,] which is dated 6/26/23 [and] has 73 color photos and M.S. 1 through M.S. 935[,] which we have previously tendered." The State also provided defendant with a motion to continue, which sought to postpone trial until August 17, 2023. The court told defendant that he could argue in response to that motion when he argued his own motion alleging a speedy-trial violation. Defendant then indicated that the tendered discovery contained information relating to the victims. He stated, "So they can take it back today and do whatever they feel like they need to do with it or whatever, whatever, but I don't want to be held responsible for being in charge or being in possession of information I am not even supposed to have." Defendant returned the discovery to the State for redaction. The court advised the State to have it back by Friday.

¶ 10    On June 30, 2023, at the outset of the proceedings, the State tendered to defendant "1,027 pieces of discovery," which included 92 photographs. The trial court then told defendant that it would hear his argument on his motion to dismiss based on a speedy-trial violation. The State advised the court that it had filed a motion to extend the speedy-trial deadline by 37 days because "there [are] still many items of discovery at the lab." The State commented that, if the court were inclined to grant the State's motion, it would render defendant's motion moot. The court agreed to hear the State's motion first. After hearing argument from both sides, the court granted the State's motion, finding that the State had exercised due diligence in obtaining results of DNA testing it had not yet received.

¶ 11    The trial court asked the State how soon it could get the results from the lab. The State indicated that it would inquire and advise the court. The State commented further that it was "also in the process of reviewing and redacting and downloading all of the videos [it] ha[s] in [its] possession so [it] can get those to *** defendant." The State hoped to finish that process by the end of the following week. The court asked defendant, "[D]o you have the ability to play videos at the jail?" Defendant replied, "Yeah." The State, commenting that it did not know what was allowed at the jail, asked whether defendant preferred the videos downloaded to a "disk" or a "thumb drive." Defendant replied, "Put it on a disk." The court asked, "Do you have the ability to play a disk?" Defendant replied, "Yeah." The State agreed to provide the disks. Defendant then argued about whether the State's motion for an extension of time should have been granted. The court allowed him to argue and then stated, "I have made my ruling ***." Defendant indicated that he wanted to file a motion for a bill of particulars, which the court allowed.

¶ 12    The parties next appeared on July 27, 2023, with defendant on Zoom, for status on the DNA results. The State advised the court that the DNA testing was not yet completed but that the State had tendered to defendant, the previous day, "other testing including firearm, GSR, and toolmarked territory." The court asked defendant about the additional motions he wished to file and advised him that, "technically," those motions would "toll the speedy trial term if [the court] can't get them done before [the] trial." Defendant interrupted the court, so the court muted defendant. The court explained, "I muted you because if you interrupt me again you will not attend court again. Do not interrupt me when I'm speaking." The court told defendant that he would be "brought over on August 3rd" to file his motions.

¶ 13    On August 14, 2023, the following transpired:

"THE COURT: [Defendant] is present in the custody of the Kane County Sheriff representing himself in this matter *pro se*.

[Defendant], you were brought here today for the purpose of giving you more discovery. I'm going to allow the State to tender that discovery to you, and then after reading your motion to dismiss, which you filed on August 3rd, I'm sending the case to Judge Barsanti tomorrow morning at nine o'clock for him to determine whether or not I've been acting inappropriately in this case. I'm treating your motion to dismiss as a motion for substitution of judge for cause because you make certain allegations against me which if true means you should have another judge.

So, the case will be—I will do nothing further on your case today. It will be sent to Judge Barsanti tomorrow morning at nine o'clock. He is available to hear your motion.

So, the State will tender the discovery.

MR. STAJDOHAR: I will tender two discs at this time. They are the 417 packet that was received last week via subpoena from the Illinois State Police Crime Lab.

THE COURT: All right.

THE DEFENDANT: I object to this discovery. I don't have time to look at discovery on discs.

THE COURT: All right. I'm allowing them to give you the discovery, and I'm continuing the case until tomorrow—

THE DEFENDANT: I don't have—did you hear what I just said? I say I don't have the time. I'm in segregation. You see this? I'm in, I'm in, I'm in cuffs and shackles. I don't even have the actual time to get on the laptop and review nothing.

THE COURT: I am not doing anything further on your case based on the motion that you filed. It would be—

THE DEFENDANT: You don't get—

THE COURT: —inappropriate for me to do that.

THE DEFENDANT: —shit right anyway, bro. Like, that's what I mean—

THE COURT: All right. Get him out of here.

THE DEFENDANT: —you don't get shit right anyway. Goofy ass. This shit don't make no sense.

THE COURT: All right. Now I'm going to find you in contempt of court.

THE DEFENDANT: I don't have a problem, but I'm telling you—

THE COURT: When you—

THE DEFENDANT: (Crosstalk)

THE COURT: —cross this line again, I'm going to do it again.

THE DEFENDANT: I don't even have the time to view the shit on the disc. How you say you giving me shit over this when I don't even have the opportunity to look at it?

THE COURT: I need a CC number. I need an order continuing it to tomorrow morning."

¶ 14    In its written contempt order, the trial court stated that defendant "began speaking to the [c]ourt in a derogatory manner, including swearing, calling the [c]ourt 'bro' and refusing to stop speaking when ordered to do so." The court also noted that it "ha[d] repeatedly warned [defendant] about his behavior in court, which warnings [defendant] ha[d] largely ignored." The court sentenced defendant to six months in jail, finding that his behavior, "which occurred in the presence of the [c]ourt while court was in open session, impeded and interrupted th[e] [c]ourt's

proceedings, lessened the dignity of the [c]ourt[,] and tended to bring the administration of justice into disrepute[.]"

¶ 15    Defendant timely appealed.

¶ 16                                II. ANALYSIS

¶ 17    Defendant contends that (1) his "brief disparaging comment about the judge" was an insufficient basis for his conviction and (2) the trial court's failure to transfer the case to an impartial judge for adjudication of the alleged contempt deprived him of procedural due process.

¶ 18    It is well established that all courts possess the inherent power to punish contempt, because such power is necessary for the court to maintain its authority and exercise its judicial powers. *People v. Simac*, 161 Ill. 2d 297, 305 (1994). The type of conduct that warrants a finding of criminal contempt is "conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." (Internal quotation marks omitted.) *Id.* "A finding of criminal contempt is punitive in nature and is intended to vindicate the dignity and authority of the court." *Id.* at 305-06. "[T]he reasons for imposing punishment for criminal contempt are much the same as the rationale for punishing other types of misdemeanor criminal conduct—retribution, deterrence, and vindication of the norms of socially acceptable conduct." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990).

¶ 19    There are two types of criminal contempt—direct and indirect. *People v. L.A.S.*, 111 Ill. 2d 539, 543 (1986). Here, the trial court found defendant in direct criminal contempt. Our supreme court has described direct criminal contempt as

"contemptuous conduct occurring in the very presence of the judge, making all of the elements of the offense matters within his own personal knowledge. Direct contempt is

strictly restricted to acts and facts seen and known by the court, and no matter resting upon opinions, conclusions, presumptions or inferences should be considered. Direct criminal contempt may be found and punished summarily because all elements are before the court and, therefore, come within its own immediate knowledge." (Internal quotation marks omitted.) *Simac*, 161 Ill. 2d at 306.

¶ 20 "A court must be presented with willful conduct on the part of the alleged contemnor before citing him for contempt." *People v. Ernest*, 141 Ill. 2d 412, 424 (1990). However, intent may be inferred from the actions of the party and the surrounding circumstances. *Id.* Direct criminal contempt must be proved beyond a reasonable doubt. See *People v. Smith*, 377 Ill. App. 3d 458, 462 (2007). On appeal from a finding of direct criminal contempt, the question is "whether there is sufficient evidence to support the finding of contempt [citation] and whether the judge considered only facts within his personal knowledge." *People v. Graves*, 74 Ill. 2d 279, 284 (1979).

¶ 21 Defendant contends that the record does not establish beyond a reasonable doubt that he intended to commit a contemptuous act, where his "brief disparaging comment about the judge" was made "[i]n his frustration of trying to get the court to acknowledge his genuine concern" about his inability to review discovery (which he claims the court "ignored") and was "not intended to hinder or disrupt the proceedings." We hold that the contempt finding was proper.

¶ 22 In support of his argument, defendant directs us to *People v. Hanna*, 37 Ill. App. 3d 98 (1976). There, the *pro se* defendant made an oral motion for an order of *habeas corpus ad testificandum* for two prisoners he wished to call as witnesses. *Id.* at 98. While arguing the motion outside the jury's presence but before courtroom spectators, he was, according to the trial court's findings, " 'at times loud and boisterous.' " *Id.* at 99. He interrupted the State's objection to the motion and, "[a]fter a long and rambling statement" (*id.*), remarked:

" 'The way things are going now my side ain't ever going to be heard—uh—but I'm going to get it—I'm going to get it on the record. I'm going to make a record, because I know what happened. *This Court has messed up so much already it's pathetic.*' " (Emphasis in original.) *Id.*

The trial court found the defendant in direct criminal contempt and sentenced him to 5 months and 20 days in prison. *Id.* at 98.

¶ 23    The appellate court reversed the conviction, with one justice dissenting. *Id.* at 99-100. In so doing, the court relied on *In re Little*, 404 U.S. 553 (1972). In *Little*, a state trial court found the *pro se* criminal defendant in direct criminal contempt because, in his closing argument, he asserted "that the court was biased and had prejudged the case and that [he] was a political prisoner." *Id.* at 554. The United States Supreme Court reversed, noting that the *pro se* defendant was "entitled to as much latitude in conducting his defense as [the Court] ha[d] held is enjoyed by counsel vigorously espousing a client's cause." *Id.* at 555. The Court cited *Holt v. Virginia*, 381 U.S. 131, 133-35, 138 (1965), wherein it reversed a finding of contempt against attorneys for filing a motion for a change of venue alleging that the judge intimidated and harassed the attorneys' clients. The *Holt* Court noted that there was no allegation that the attorneys "disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties." *Id.* at 136. Based on *Holt*, the *Little* Court held that the contempt finding could not stand because there was no evidence that the defendant had made his statements boisterously or actually disrupted the proceedings in any way. *Little*, 404 U.S. at 555-56.

¶ 24    The *Hanna* court determined that "[t]he essence of the *Little* opinion seems to be that an isolated, disparaging statement not made in a loud or boisterous manner but offensive to the

sensibilities of the judge, although embarrassing to the court and derogating from its dignity, is not contempt." *Hanna*, 37 Ill. App. 3d at 99.

¶ 25     Here, however, unlike the defendants in *Hanna* and *Little*, defendant did more than make an isolated, disparaging statement. After the court explained to defendant that he was present in court so that the State could tender additional discovery, the court commented that defendant had filed a "motion to dismiss." The court advised defendant that it was treating the motion "as a motion for substitution of judge for cause" because defendant had made "certain allegations" against the court. When the court indicated that it would allow the State to tender the discovery, defendant objected. The court then attempted to explain to defendant that he was simply "allowing [the State] to give [defendant] the discovery" and "continuing the case until tomorrow," because it would be "inappropriate" for the court to do "anything further on [defendant's] case based on the motion that [defendant] filed." As the court was so informing defendant, he interrupted three times. He used profanity, twice telling the court that he does not "get shit right anyway," and referred to the court as "bro." After the court said, "Get him out of here," defendant called the court a "[g]oofy ass," and stated, "This shit don't make no sense." The court then found defendant in contempt. Defendant's actions, which all occurred in the court's presence, were sufficient beyond a reasonable doubt to find defendant guilty of direct criminal contempt. Defendant not only disdained the court with profanity and slights such as "bro" and "[g]oofy ass," but his repeated interruptions impeded the administration of justice. See *People v. Smith*, 377 Ill. App. 3d 458, 460, 462 (2007) (the defendant's request that the judge sentence him so that he could " 'get the f*** up out of [the judge's] face' " was sufficient to sustain the finding of direct criminal contempt, given that the defendant interrupted the judge while he was speaking and used profanity).

¶ 26 We reject defendant's attempt to justify his statements as being made from "frustration" when the trial court "ignored his concerns" about his inability to review discovery. Defendant suggests that he "raised the issue of his inability to adequately review discovery and prepare for trial *** multiple times in front of the trial court prior to his contempt finding." He asserts that the court "refus[ed] to address or even acknowledge a legitimate issue he was having with the discovery process as a *pro se* litigant." He argues:

"[Defendant's] objection to the jail restrictions and their effect on his ability to prepare for trial while exercising his constitutional right to self-representation was a legitimate concern, one which the trial court should have taken seriously. But, instead, the court ignored [defendant's] objections and concerns. *** Given the court's refusal to even acknowledge [defendant's] concerns about the violation of his constitutional rights, it is understandable that [defendant] became frustrated by what he perceived to be the court's total indifference to his issues."

¶ 27 Our review of the record paints a very different picture. First, before the August 14, 2023, hearing, defendant did not indicate that he was having any issues reviewing discovery. Indeed, the record shows that the State had previously provided defendant with over 1000 pages of discovery and that defendant had no problems reviewing it. In fact, when defendant learned that the discovery contained certain information concerning the victim, he brought it to the court's attention and returned the discovery to the State for redaction. The State then returned the discovery to defendant a few days later.

¶ 28 Moreover, concerning the discovery at issue on August 14—two discs—we note that defendant had previously *expressly agreed* to receive discs. At the June 30, 2023, hearing, when the State advised that it had videos to turn over, the court asked defendant, "[D]o you have the

ability to play videos at the jail?" Defendant replied, "Yeah." The State, commenting that it did not know what was allowed at the jail, asked whether defendant preferred the videos downloaded to a "disk" or a "thumb drive." Defendant replied, "Put it on a disk." The court asked, "Do you have the ability to play a disk?" Defendant replied, "Yeah." Contrary to defendant's claim, the court had made every effort to ensure that defendant could access any discovery he received. We note, too, that when defendant indicated that he was having problems doing research (as opposed to reviewing discovery), the court was sympathetic to his concerns and told defendant it would request that the jail allow "extra time" to use the tablet. Thus, defendant's claim that the court ignored "significant, ongoing discovery issues" is tenuous at best and thus does not justify his outbursts. Further, the court made clear at the August 14 hearing that, given defendant's recent motion, it could take no further action on his case and was simply allowing the State to tender the discs to defendant. Indeed, the court's actions demonstrated a commitment to balancing the progress of the case with addressing defendant's concerns, while at the same time maintaining the integrity of the judicial process.

¶ 29    Defendant next contends that the trial court's failure to transfer the case to an impartial judge to adjudicate the alleged contempt deprived him of procedural due process. We review *de novo* whether a procedure maintained a defendant's right to due process. *People v. Stoecker*, 2020 IL 124807, ¶ 17.

¶ 30    Defendant acknowledges that a finding of direct criminal contempt may be made summarily and immediately after the contemptuous conduct occurs. See *Betts*, 200 Ill. App. 3d at 49. However, he argues that, in some instances, the matter should be assigned to another judge for that determination. In support, he directs us to *Betts*, where the Fourth District stated as follows:

"A finding of direct contempt may be made in a summary manner immediately after the contemptuous conduct occurs. This is the practice followed if the purpose of imposing sanctions is to restore order in the courtroom or to maintain control over proceedings in the courtroom. [Citations.] However, where the immediate imposition of direct contempt sanctions is not necessary to maintain order in the courtroom, a contempt adjudication may be postponed until after the conclusion of the trial or hearing. At that time, the presiding judge may either make a direct contempt adjudication [citation] or assign the matter of the purported direct contempt to another judge for determination solely upon the record of the proceedings in which the contemptuous conduct allegedly occurred." *Id.* at 49-50.

Relying on *Mayberry v. Pennsylvania*, 400 U.S. 455, 464, 466 (1971), the *Betts* court further stated:

"Where (1) an individual reviles a judge during a judicial proceeding, (2) it is likely the remarks 'left personal stings,' and (3) sanctions for contempt are not immediately imposed for the purpose of maintaining order in the courtroom, due process requires adjudication of the contempt charges by a judge other than the one who presided at the proceedings in which the contemptuous conduct allegedly occurred. [Citation.]" *Betts*, 200 Ill. App 3d at 50.

¶ 31    Defendant argues that all three requirements noted in *Betts* are met here. We disagree. The record makes clear that the sanctions in this case were immediately imposed to maintain order in the courtroom. As the trial court's order noted, defendant's conduct occurred "while [the] court was in open session, [and] impeded and interrupted [the c]ourt's proceedings." Indeed, after defendant interrupted the court, stating that the court did not get "shit right anyway" and calling

the court "bro," the court told the bailiff to "[g]et him out of here." Nevertheless, defendant kept talking, again telling the court that it "don't get shit right anyway" and calling the court a "[g]oofy ass." At that point, the court found defendant in contempt. Still, defendant continued talking, causing the court to advise defendant that if he "cross[ed] this line again," he would be found in contempt again. We find no error in the court's summary disposition, as it was necessary and appropriate to address defendant's misconduct and maintain order in the courtroom.

¶ 32    *Mayberry* is readily distinguishable. There, at the conclusion of a 21-day trial, the trial court found that the *pro se* defendant "had committed one or more contempts on 11 of the 21 days of trial and sentenced him to not less than one nor more than two years for each of the 11 contempts or a total of 11 to 22 years." *Mayberry*, 400 U.S. at 455. The Supreme Court vacated the finding and remanded for a hearing before a different judge, holding that, "where *** [the court] does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place." *Id.* at 463-64. Defendant argues that the present case is "effectively" like *Mayberry* because, in finding defendant in contempt, the court "seemed to rely on [defendant's] conduct throughout the pendency of the case." We disagree. Although the court noted that it had repeatedly warned defendant about his behavior, the court's finding of contempt was based on defendant's actions on August 14. Notably, the *Mayberry* court found that, "[a]s the[ ] separate acts or outbursts took place," the trial court "could, with propriety, have instantly acted, holding [the] [defendant] in contempt." *Mayberry*, 400 U.S. at 463. That is precisely what happened here.

¶ 33                                III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 35    Affirmed.